In re CENTRAL EUROPEAN INDUS-
TRIAL DEVELOPMENT COMPA-
NY, LLC d/b/a Ceidco, Debtor.

In re The Kontrabecki Group
LP, Debtor.

Aron M. Oliner, as Chapter 11 Trustee
of The Kontrabecki Group Limited
Partnership, and Lehman Brothers
Holdings, Inc., Plaintiffs,

v.

John Kontrabecki, Defendant.

Bankruptcy Nos. 02–30419, 02–30421.
Adversary No. 03–3264.

United States Bankruptcy Court,
N.D. California.

Nov. 27, 2006.

Joan M. Chipser, Law Offices of Joan M. Chipser, Millbrae, CA, for Debtor, Central European Industrial Development Company, LLC.

Joel K. Belway, Law Offices of Joel K. Belway, San Francisco, CA, for Debtor, The Kontrabecki Group LP.

Aron M. Oliner, Buchalter, Nemer, Fields and Younger, San Francisco, CA, for Plaintiffs.

## MEMORANDUM DECISION REGARDING COMPENSATORY CONTEMPT DAMAGES, SECOND BILL OF PARTICULARS

DENNIS MONTALI, Bankruptcy Judge.

Plaintiff Lehman Brothers Holdings Inc. ("Lehman") has filed a motion entitled Lehman Brothers Holdings Inc.'s Motion and Memorandum Summarizing and Requesting the Award of Compensatory Contempt Damages Associated with Lehman's Second Bill of Particulars (the "Motion," docket no. 1265) together with supporting documents (docket nos. 1264–1279, filed Apr. 13–14, 2006). The Motion covers the period from November 1, 2004, through December 31, 2005. Lehman seeks $3,369,891.52[1] in compensatory contempt

---

1. Lehman's motion papers state the amount as one penny less, but this appears to be a mathematical error. *See* Motion Ex. A.

damages consisting of $3,239,939.36 in legal fees and $129,952.16 in expenses. For the reasons set forth below the court will award Lehman $3,197,891.02.

## II. Background [2]

■ In violation of the automatic stay John Kontrabecki ("Kontrabecki") caused the dilution of shares of stock of two Polish subsidiaries that were previously 100% owned by debtor The Kontrabecki Group LP ("TKG"). The dilution reduced TKG's interest to that of a minority shareholder. This adversary proceeding was commenced by Lehman and Aron M. Oliner, the Chapter 11 Trustee of The Kontrabecki Group Limited Partnership ("Trustee"), to unwind the transfer of control of the Polish subsidiaries and to recover damages from Kontrabecki. Lehman is now prosecuting this action pursuant to a settlement with Trustee, as described in the Amended Memorandum Decision Regarding Compensatory Contempt Sanctions filed on August 5, 2005 (docket no. 988).[3]

Kontrabecki alleged that he was unable to unwind the transfer but over time the evidence accumulated that he was controlling transferee Piotr Kukulka ("Kukulka") to frustrate the unwind. The court imposed coercive sanctions including fines and eventually periods of incarceration. Progress was halting and when not suffi-

ciently coerced Kontrabecki frustrated the unwind but eventually it was accomplished.

Lehman sought damages flowing from Kontrabecki's contumacious behavior, limited at this point to legal fees and expenses incurred by it and Trustee. The court has ruled that compensatory damages are appropriate when the "contumacious behavior significantly contributed to the [harm]" and "such a result was foreseeable." *In re General Motors Corp.*, 110 F.3d 1003, 1018 (4th Cir.1997). The attorneys' fees and expenses must also be reasonable. Applying these standards the court previously awarded Lehman a total of $5,968,230.00 on its request for $6,664,295.00 in compensatory contempt damages for the period from March 1, 2003, through October 31, 2004 (the "Award"). Lehman's present Motion includes fees incurred in attempting to collect the prior Award.

Kontrabecki filed an Opposition to the Motion and supporting papers on August 23, 2006 (docket nos. 1346–1348). Lehman filed a Response on September 8, 2006 (docket no. 1360). The matter was argued on September 26, 2006, and submitted for decision.

## III. Issues

### A. General objections

■ Kontrabecki argues that Lehman's request for attorneys' fees and expenses

---

2. The following discussion constitutes the court's findings of fact and conclusions of law. Fed. R. Bankr.P. 7052(a).

3. Kontrabecki objects in a footnote that after this settlement it is unclear why Trustee should have performed any work at all. Lehman has not responded to this objection.

The court has reviewed Trustee's declaration and the attached daily timesheets (docket no. 1278) ("Trustee Decl."). The largest portion of the $18,439.00 in fees were incurred in response to Kontrabecki's request for further billing detail in connection with

fees earned prior to the settlement agreement. *See* Trustee Decl., daily timesheets and Ex. E (summary). The court will allow those fees. After the settlement agreement the bankruptcy estates still had at least a potential interest in this litigation, but the estates' chances of any significant recovery are becoming increasingly remote. Therefore the court will allow some fees for monitoring this litigation, especially in the months immediately following the settlement, but will disallow *$3,000.00* based on Kontrabecki's unopposed objection.

"crosses the line between compensatory civil contempt sanctions and punitive sanctions." Opp. p. 1:22–23 (footnote omitted). He claims that Lehman was inefficient, has "overlawyered virtually every issue," and has had at least two and sometimes three lawyers participating in every hearing, telephone conference, and deposition. Opp. pp. 3:4–12, 24:26–27, 25:2–11. Kontrabecki has reviewed the time spent by Lehman's principal timekeepers and arrived at an overall percentage reduction that he believes is justified.[4] On this basis he argues that Lehman should recover no more than $1,200,824.00 in fees and $48,164.00 in expenses, a reduction of over two thirds. Opp. p. 4:1–16 and Appendix.

The court rejects this blanket reduction. Kontrabecki has provided no rational basis for the percentage reductions he chooses. Nor has the court's own review suggested that any sort of blanket reduction in Lehman's fees and expenses is warranted. It is true that Lehman has vigorously litigated this adversary proceeding using a team of lawyers, but Kontrabecki has had his own team of two or three lawyers at virtually every hearing and has been at least as vigorous in his own litigation and efforts to frustrate the unwind. Lehman would be disadvantaged if it put forward a lesser legal team to deal with Kontrabecki.

Kontrabecki implies that he has been caught in a trap in which he is required to effect the unwind but prevented by Lehman from doing so, and that Lehman's fees should be disallowed on that basis. He claims that Lehman "focused its efforts on *preventing* [him] from raising" the $5 million that he claims he needed to recover the Polish subsidiaries' stock. Opp. p. 2:3 (emphasis added). Lehman's alleged mo-

tive was to keep him incarcerated indefinitely. The court is not persuaded.

The court has previously found that Kontrabecki controls Kukulka, so Kontrabecki could have avoided all delays by simply directing Kukulka to accomplish the unwind. Regardless whether the $5 million transfer to Kukulka was a sham payment or served some other purpose, Kontrabecki has not established that he needed to raise any funds at all.

Alternatively, assuming for the sake of discussion that Kontrabecki and Kukulka had a falling out (despite all the evidence to the contrary) and that it was therefore necessary for Kontrabecki to raise the $5 million and negotiate complex unwind documentation, Kontrabecki himself was still primarily responsible for any delays and inefficiency in accomplishing these tasks. The court has previously found that many aspects of the unwind documentation presented by Kontrabecki were unreasonable, such as provisions (allegedly drafted by Kukulka) for Kontrabecki's exculpation by Lehman. Lehman was also entitled to be particularly cautious given Kontrabecki's history, which includes transferring control of TKG's only assets away from its bankruptcy estate and then repeatedly frustrating the unwind of that transfer. For example, Lehman was justified in seeking safeguards before Kontrabecki was permitted to liquidate substantial United States assets and transfer $5 million in proceeds to Poland. The court finds below that not *all* of Lehman's requested safeguards were reasonable but most issues could have been resolved quickly by Kontrabecki had he been inclined to do.

Focusing on Lehman's efforts to collect the Award, Kontrabecki objects that Lehman incurred nearly $1.5 million on this

---

4. The court only required principal timekeepers to break down their time into detailed categories, so Kontrabecki has assumed that the same reduction is appropriate for non-principal timekeepers.

task which he calls an "obscene" and unjustified amount. Opp. p. 2:20–22. Although the court agrees that there has been extensive legal work in this adversary proceeding, there is ample evidence that Lehman's efforts to collect the Award were necessary and that Kontrabecki was not using his best efforts to pay the Award. One example among many is Kontrabecki's preposterous representation through his attorneys that he interpreted Lehman's demands and the court's orders directing him to pay the Award to mean that he should pay only the entire dollar amount and was therefore under no obligation to pay any lesser portion. *See* Transcript, Dec. 14, 2005, pp. 7:18–8:5 (attached as Ex. 5 to Declaration of Peter J. Benvenutti re Transcripts in Support of Lehman Brothers Holdings Inc.'s Documentary Proof of Compensatory Contempt Damages, filed Apr. 13, 2006, docket no. 1268). Faced with such tactics it is not surprising that Lehman incurred a large amount of attorneys' fees in collecting the Award.

For all of these reasons the court will not impose any blanket reduction in Lehman's fees and expenses. Each of Lehman's activities challenged by Kontrabecki will be evaluated on its own merits.

B. *Specific objections*

1. *The 2004 Thanksgiving Furlough*

■ Kontrabecki points out that although Lehman did not oppose his request for a Thanksgiving furlough it would not stipulate to a furlough, forcing him to file a motion and appear at a hearing to obtain a brief release from incarceration. Lehman argues that it was appropriate to require a hearing so that it could express its reluctance both to the court and to Kontrabecki, and not give the impression that future furloughs would be acceded to in the ordinary course. On this point the court agrees with Kontrabecki. With or without a hearing both the court and Kontrabecki were well aware of Lehman's reluctance to accede to any relaxation of coercive sanctions.

That said, as Kontrabecki tacitly concedes that "the task at hand" was not so much whether he would have a furlough as "determining the procedure for [his] release and subsequent resubmission to custody." Opp. p. 7:2–3. The hearing was useful for that purpose so the court will only disallow a portion of Lehman's fees.

■ The court has not been able to determine the precise amount of fees attributable to this task. The court attempted to do so by reviewing daily time records and by cross-referencing Lehman Brothers Holdings Inc.'s Second Bill of Particulars Regarding Compensatory Contempt Damages, filed on April 13, 2006 (docket no. 1266) (the "Second Bill of Particulars"), p. 5:4–6, with Lehman's Motion (docket no. 1265), Ex. B, to determine that this task falls within category "hh." Unfortunately, category "hh" includes other tasks and the "hh" time entries are not broken down into smaller time increments. For example, an entry for "11/23/04" attached to the declaration of Mr. Kaufman (docket no. 1269, filed Apr. 13, 2006) ("Kaufman Decl.") reflects 6.4 hours for "hh" tasks that include everything from "Polish developments" to Kontrabecki's access to a telephone while in prison to "Kontrabecki's release over holidays." It is impossible to know precisely how much time is attributable to the Thanksgiving furlough. *See also* Declaration of Peter J. Benvenutti in Support of Lehman Brothers Holdings Inc.'s Documentary Proof of Compensatory Contempt Damages, filed Apr. 13, 2006 (docket no. 1273) ("Benvenutti Decl."), Ex. A, entries for 11/15/04 through 11/24/04. In the absence of greater detail the court has used a rough estimate of Lehman's time spent on

this task. The court has probably overestimated the time spent—this task probably did not take much time, considering that no papers were filed by Lehman in opposition to Kontrabecki's motion for a furlough. This seems appropriate because it is Lehman's initial burden to establish the proper amount of its fees. The court has assumed that this task occupied as much as 7 hours of Mr. Kaufman's time at $435/hr., 1 hour of Mr. Brow's time at $260/hr., 7 hours of Mr. Benvenutti's time at $590.00/hr., and 0.1 hours of Ms. Toops' time at $335/hr., for a total of $7,468.50. Out of this amount the court will disallow *$4,000.00*.[5]

### 2. Lehman's "Protective Motion"

■ Kontrabecki objects that after he and Lehman agreed to unwind documentation Lehman filed a motion for approval of the documentation which in reality sought additional relief that the court later denied (docket no. 877, filed Apr. 26, 2005) (the "Protective Motion"). Kontrabecki points out that at the hearing on the Protective Motion the court characterized it as (a) seeking an advisory opinion, (b) attempting to rewrite a portion of the parties' agreement, and (c) seeking to expand the court's exclusive jurisdiction without an adequate basis to do so. Opp. pp. 8:10–17, 9:14–10:3. Lehman first responds that its concerns about how Kontrabecki might undermine the unwind transaction were justified. Resp. p. 10:6–11. That is not the

point. The issue is not whether Lehman's concerns were justified but what remedies it sought and whether Kontrabecki should be forced to pay legal fees for seeking remedies which the court denied. On this issue the court mostly agrees with Kontrabecki. The court is nevertheless somewhat persuaded by Lehman's alternative argument that the motion served its purpose. Resp. p. 8:23–25. The arguments and colloquy at a lengthy hearing on the Protective Motion on April 28, 2005, clarified some complex legal issues and most of those issues would have had to be addressed anyway when Kontrabecki later attached the $5 million in Poland before those funds were transferred to Kukulka. Balancing these considerations the court will disallow roughly two thirds of Lehman's time spent on the Protective Motion.

The court has reviewed the time entries for the weeks before and after the Protective Motion was filed on April 26, 2005, and estimates that this task occupied as much as 19 hours of Mr. Kaufman's time at $435/hr., 0.4 hours of Mr. Brow's time at $260/hr., 9.5 hours of Mr. Benvenutti's time at $630/hr., 0.6 hours of Ms. Toops' time at $405/hr., and 9.0 hours of Ms. Whitehead's time at $230/hr. for a total of $16,667.00.[6] Out of this amount the court will disallow *$12,000.00*.

### 3. Motion for Release

■ Kontrabecki argues that Lehman should not be compensated for opposing

---

5. The court has used rough estimates for this and other tasks rather than inviting a further round of litigation over the precise dollar amounts. The court wishes to avoid any further expense to any party on the issues discussed herein, mindful that there has already been an enormous amount of litigation in this adversary proceeding and the parties are already disputing such issues as Lehman's current fees incurred to collect its past fees.

6. Lehman appears to have already written off some time related to the Protective Motion. The earliest relevant time entry attached to Mr. Kaufman's declaration (docket no. 1269) is for Apr. 14, 2005, but that entry describes *"further* edits to protective motion" (emphasis added) suggesting that the motion had already been drafted. The court has found no evidence of such earlier work in March or April of 2005 in the timesheets attached to either Mr. Kaufman's or Mr. Benvenutti's declaration.

his Motion for Release from Coercive Sanctions filed on May 2, 2005 (docket no. 894) because the court released him on indefinite furlough. As Kontrabecki concedes, however, that release was conditioned on a strict timetable for wiring the $5 million to Poland, executing the share transfer agreements, and registering the share transfers. Opp. pp. 11:25–12:2.

Kontrabecki claims that there was "no justification for keeping him incarcerated when all the steps necessary to finalize the transfers were within the sole discretion of Lehman to take" (Opp. p. 12:2–4) but the steps just mentioned were largely within his control, either directly or through Kukulka. Lehman's attorneys' fees for opposing the Motion for Release are compensable and Kontrabecki's objections on this point are overruled.

### 4. Delayed registration in Poland

■ Kontrabecki claims that he was forced to remain incarcerated for two additional months because of a bureaucratic delay in the Polish courts in transferring a file from Warsaw to Kielce, where Kukulka had moved the corporate headquarters of one of TKG's Polish subsidiaries. Kontrabecki claims that Lehman's activities at this time did nothing to further the registration and that he had "no role" in the process so, he implies, no amount of coercion could help the unwind because it was out of his hands. Opp. p. 13:17.

This ignores the court's contrary findings. Kontrabecki himself quotes the court's finding that Kukulka's activities that caused the bureaucratic delays were part of "the scheme" with Kontrabecki, and that "it's time to put the pressure back on" in the form of coercive sanctions.

Kontrabecki split his objections regarding the delayed registration in Poland into two sections of his Opposition's argument: II. A.1.d. and II.A.1.g. Lehman addresses them

Opp. p. 13:12–14 (quoting Transcript, June 23, 2005, p. 8:2–25).

Kontrabecki also argues that Lehman should have taken the initiative and met sooner with the Chairman of the Warsaw court to try to expedite the transfer of the file to Kielce. Opp. pp. 16:3–17:7.[7] Lehman principally argues that it was Kontrabecki's obligation to "clean[ ] up the mess he had created." Resp. p. 11:9–10. The court is not entirely persuaded by this argument because in the court's view Lehman was not entitled to sit by indefinitely even if the primary responsibility was with Kontrabecki to effect the unwind. The court is more persuaded by Lehman's alternative argument that it saw the prospect of becoming proactively involved in the registration process as a minefield because Kontrabecki would have seized on any opportunity to argue that Lehman was responsible for any delay or disruption in the unwind. Lehman therefore was hesitant before getting involved. Lehman's concerns were legitimate. Kontrabecki had an affirmative duty to try to accomplish the unwind, he has pointed to no evidence that he cooperated with Lehman to determine what steps could be taken to expedite the process, and it is too easy for him to say in hindsight that Lehman should have taken the initiative that he did not take himself. Lehman's attorneys' fees on this issue are compensable and Kontrabecki's objections to those fees are overruled.

### 5. Lehman's Motion to Expand Coercive Sanctions

■ After Lehman learned that Kontrabecki had attached the $5 million in Poland—the funds that Kukulka had al-

both in section B.4. of its Response. *See* Resp. p. 10 lines 6 and 25 (citing Opp. Sections II.A.1.d. and II.A.1.g.).

legedly demanded in connection with the unwind—Lehman filed a Motion and Memorandum of Law of Lehman Brothers Holdings Inc. to Modify and Expand Coercive Sanctions Against Defendant John Kontrabecki (docket no. 939, filed July 5, 2005) (the "Motion to Expand Coercive Sanctions"). The motion sought to extend Kontrabecki's incarceration, even after the unwind transfers were registered in Poland, until he either dismissed his Polish lawsuit against Kukulka or else obtained a release from Kukulka that waived potential claims against Lehman and waived Kukulka's ability to challenge the unwind. Lehman argued that the alleged dispute between Kontrabecki and Kukulka was a sham, and alternatively that it gave Kukulka numerous avenues to disrupt or rescind the unwind, and that these were sufficient grounds to keep Kontrabecki incarcerated. The motion was lengthy and was supported by a large appendix and an extensive declarations from Lehman's Polish counsel (docket no. 941, filed July 5, 2005, and later no. 973, filed July 21, 2005) about the possible ramifications of what Kontrabecki had already done and what he and Kukulka might do in future.[8]

The court denied Lehman's motion because the harms it anticipated might never occur and the incarceration it proposed had no definite end and could have lasted literally years, until Kontrabecki's lawsuit against Kukulka was resolved by the Polish courts. Nevertheless, Lehman is correct that the motion accomplished much of what it sought. In denying the motion the court (a) rejected Kontrabecki's argument that the unwind documentation essentially gave him permission to sue Kukulka regardless of any future adverse consequences to TKG and Lehman, (b) held that if Kontrabecki's activities turn out to have prevented the complete accomplishment of the unwind then he "has violated the [court's] orders," and (c) ruled that "[i]t is foreseeable that [the] harms [anticipated by Lehman] might arise" from Kontrabecki's activities. See Memorandum Decision Regarding Motion to Modify and Expand Coercive Sanctions Against Defendant John Kontrabecki, filed Aug. 9, 2005 (docket no. 1004) at 4:6–12 and n. 6 (attached as Ex. 22 to Request for Judicial Notice in Support of Defendant John Kontrabecki's Opposition to Lehman Brothers Holdings Inc.'s Motion for Award of Compensatory Contempt Damages Associated with the Second Bill of Particulars, filed Aug. 23, 2006, docket no. 1347 (the "Kontrabecki RJN")).

Since the date of the court's ruling Kukulka has apparently made no attempt to rescind the unwind. Kontrabecki argues that Kukulka's inaction (and the fact that the unwind happened at all) are evidence that Lehman's responses to his activities were unnecessary. See, e.g., Opp. pp. 10:17–11:4, 12:6–10, 14:3–4. To the contrary, Kukulka's inaction after more pressure was put on Kontrabecki is further evidence that Kontrabecki controls Kukulka.

For these reasons the court is inclined to disallow some but by no means all of Lehman's fees regarding the Motion to Expand Coercive Sanctions. The court is also inclined to reduce Lehman's fees

---

8. Lehman later filed another declaration by Bartosz Grohman, one of its Polish attorneys (filed Oct. 25, 2005, docket no. 1090), describing potential harms that might arise if the court were to grant Kontrabecki's Motion for Order Dissolving Injunction, Terminating Coercive Sanctions and Directing Return of Passport. The court has treated the time spent on this declaration as if it had been submitted in support of Lehman's Motion to Expand Coercive Sanctions, and has disallowed some of that time, because for purposes of this discussion it raises the same issues.

somewhat for inefficiency. The court recognizes that this was a difficult motion to prepare because Lehman did not want to provide Kontrabecki and Kukulka with a roadmap for actions they might take but at the same time Lehman wanted to establish that further incarceration was warranted to coerce Kontrabecki's compliance with his obligation to completely effect the unwind. Nevertheless, the court's review of the motion papers suggests some inefficiency by Lehman's counsel, as does the court's calculation of the total dollar amount expended on this one motion.

The court has reviewed the time entries for June, July and half of August, 2005— i.e., from more than one month before the motion until a week or so after the court's written decision thereon. The court estimates that this task occupied approximately 186.7 hours of Mr. Kaufman's time at $435/hr. (i.e., $81,214.50), 3.0 hours of Mr. Aldridge's time at $440/hr. (i.e., $1,320.00), 13.3 hours of Mr. Brow's time at $260/hr. (i.e., $3,458.00), 13.6 hours of F.L. Russell's time at $175/hr. (i.e., $2,380.00), 51.4 hours of Ms. Chandler's time at $165/hr. (i.e., $8,481.00), 37 hours of Mr. Benvenutti's time at $630/hr. (i.e., $23,310.00), 15.6 hours of Ms. Toops' time at $405/hr. (i.e., $6,318.00), 46.5 hours of Ms. Whitehead's time at $230/hr. (i.e., $10,695.00), 18.4 hours of Mr. Stone's time at $175/hr. (i.e., $3,220.00), 28.7 hours of Mr. Gilicinski's time at $425/hr (i.e., $12,197.50), 42.9 hours of Mr. Grohman's time at $315/hr (i.e., $13,513.50), and 41.0 hours of B. Koczetkow's time at $195/hr (i.e., $7,995.00), for a total of $174,102.50.[9] Out of this amount the court will disallow *$87,000.00.*

### 6. *Lehman's motion to withhold Kontrabecki's passport*

■ Kontrabecki objects to Lehman's fees incurred in an unsuccessful attempt to prevent him from retrieving his passport from Trustee. Opp. pp. 14:21–15:21. Kontrabecki objects that Lehman's Motion for Order for Continued Withholding of Kontrabecki's Passport, filed on October 5, 2005 (docket no. 1073) (the "Passport Motion"), cited no legal authority that justified retaining his passport. Opp. p. 15:12–13. Kontrabecki is incorrect. Lehman cited several relevant cases and as the court long ago observed the power to incarcerate implies the lesser power to condition freedom from incarceration on turning over a passport.

The court is somewhat persuaded by Kontrabecki's alternative argument that the harm that Lehman sought to address was too speculative. The closing of the unwind had already taken place on May 19, 2005, and as discussed above although it was foreseeable that Kukulka and Kontrabecki might somehow attempt to reverse the unwind it was also possible that such harm would never occur. The court had recently refused on this basis to extend Kontrabecki's incarceration by denying Lehman's Motion to Expand Coercive Sanctions.

On the other hand, Lehman had cause to believe that further coercion might be necessary, or that Kontrabecki might pose a flight risk, or both. He already had a history of frustrating the court's orders, he had been ordered in February of 2003 to take "all steps available to him" to cause the unwind but delayed the unwind until May of 2005 largely by claiming that Ku-

**9.** *See* daily timesheets attached to Kaufman Decl. (especially category "kk") and Benvenutti Decl. for June through early August, 2005, and daily timesheets attached to Decl. of Lech Gilicinski in Support of Lehman Brothers Holdings Inc.'S Documentary Proof of Compensatory Contempt Damages (filed Apr. 13, 2006, docket no. 1275) for June through October, 2005 (see footnote 8 above regarding October time).

kulka was beyond his power or the court's jurisdiction in Poland, he sought the return of his passport to travel to Poland, he had liquidated assets in the United States including his home, he claimed that his remaining assets in the United States were either encumbered or could not be liquidated whereas he claimed that his assets in Poland had substantial equity, he had recently transferred $5 million to Poland, he had then attached that $5 million in Poland, and his counsel advised Lehman that he intended to contact the Polish prosecutor's office claiming that Kukulka had extorted the $5 million from him. *See* Passport Motion (attached as Ex. 25 to Kontrabecki RJN, docket no. 1347). All of this might reasonably suggest to Lehman that Kontrabecki was a flight risk, or intended to reverse the unwind, or both.

After hearing arguments on the Passport Motion the court decided that on balance withholding Kontrabecki's passport would have been too great an imposition on him as an international businessman and the harms envisioned by Lehman were too speculative to justify that imposition. Still, Lehman's attempt to prevent the return of Kontrabecki's passport was both foreseeable and not entirely unreasonable. Weighing these considerations the court will disallow approximately two thirds of Lehman's time on this matter.[10]

The court has reviewed Lehman's daily timesheets and has found some time related to the passport issue in June of 2005, shortly after the unwind closing took place in Poland, with the bulk of the time in October of 2005 through shortly after November 1, 2005, when the court rendered its decision. Lehman's time is not broken down into specific allotments for preparation of the Passport Motion but the court estimates that this task occupied roughly 6.9 hours of Mr. Kaufman's time at $435/hr. ($3,001.50), 0.3 hours of Mr. Aldridge's time at $440/hr. ($132), 18.8 hours of Mr. Benvenutti's time at $630/hr. ($11,844.00), and 15.5 hours of Ms. Toops' time at $405/hr. ($6,277.50) for a total of $21,255.00. Out of this amount the court will disallow *$14,000.00.*

7. *Lehman's uncategorized billing records*

Kontrabecki objects that Lehman seeks fees for providing greater detail regarding its previously uncategorized fees, as ordered by the court (Opp. p. 18:11–25), but as Lehman points out the court already reduced Lehman's fees associated with preparing its initial bills by over $340,000.00 because there was not enough detail in those bills. Resp. p. 13:12–22. *See* Memorandum Decision Regarding Compensatory Contempt Sanctions, pp. 20:8–21:26, filed July 27, 2005 (docket no. 980) (attached as Ex. 31 to Kontrabecki RJN). If Lehman's fees were reduced again for providing that detail then Kontrabecki would receive a double recovery.

Kontrabecki objects to Lehman's motion in limine to address what it calls "a legal issue [that] it believed Mr. Kontrabecki *might* raise in his yet-to-be [filed] opposition brief to Lehman's request for compensatory sanctions." Opp. pp. 18:26–19:9. As Lehman points out, Kontrabecki's attorneys made inconsistent statements and strongly suggested that they would present the disputed legal issue at a

10. On October 25, 2005, Lehman also filed an Opposition of Lehman Brothers Holdings Inc. to Kontrabecki's Motion for Order Dissolving Injunction, Terminating Coercive Sanctions and Directing Return of Passport (docket no. 1088). In general the time spent by Lehman's attorneys on this opposition undoubtedly focused on the non-passport issues and did not involve new research or significant drafting on the passport issue because Lehman had already done most of that work in connection with the Passport Motion.

later time, which Lehman rightly feared would further delay an already protracted process. Resp. p. 14, n. 4. This type of situation is what a motion in limine is for. The court will not disallow any fees on this basis.

██ Kontrabecki persuasively objects that Lehman seeks to bill him for unsuccessfully opposing a further motion for more detail entitled Motion of John Kontrabecki for More Definite Statement of Lehman's Claimed Compensatory Contempt Damages, filed Nov. 22, 2004 (docket no. 769) (the "Motion for More Definite Statement"). Opp. p. 18:3–10. Lehman filed its response on December 15, 2004 (docket no. 801). Lehman now argues that Kontrabecki did not make use of the greater detail that it was forced to provide and what he "should have done in the first place was what he in fact did later: complain about the specific activities [that] he thought should not be compensated and ask the Court to instruct Lehman, in every case where the Court agreed with him, to calculate fees associated with the activity and deduct them from its submission." Resp. p. 14:15–19. The weakness in Lehman's argument is that the greater detail was important so that Kontrabecki could know what "specific activities" he should complain about. It is difficult to know if a litigant's attorneys have been inefficient on any given task without having a breakdown by task and principal attorney. The court will disallow Lehman's fees in opposing Kontrabecki's Motion for More Definite Statement.

The court has reviewed Lehman's fees from November 22, 2004, when the Motion for More Definite Statement was filed, through the date of the hearing and oral ruling on the motion on January 21, 2005. Based on that review the court estimates that this task occupied roughly 33.1 hours of Mr. Kaufman's time at $435/hr. ($14,-

398.50), 70.0 hours of S. Chandler's time at $165/hr. ($11,550.00), 16.2 hours of T. Vu's time at $195/hr. ($3,159.00), 6.4 hours of Mr. Brow's time at $260/hr. ($1,664.00), 12.2 hours of Mr. Benvenutti's time at $590/hr. ($7,198.00) and 0.7 hours of his time at $630/hr. ($441.00), 5.7 hours of Ms. Toops' time at $335/hr. ($1,909.50), 7.1 hours of Ms. Whitehead's time at $210/hr. ($1,491.00), and 16.3 hours of Mr. Stone's time at $165/hr. ($2,689.50) for a total of *$44,500.50*, all of which is disallowed.

8. *Activities in anticipation of attachment*

██ Kontrabecki objects that Lehman sought and obtained an order giving it the right to attach his assets and took discovery regarding those assets but then never attached anything. He argues that Lehman's efforts "just resulted in more wasted time and resources." Opp. p. 20:12.

The court disagrees. As Lehman argues, the discovery revealed assets that could be liquidated to pay the Award despite Kontrabecki's claim that he had none. Resp. p. 15:14–16. The attachment became unnecessary because Kontrabecki agreed to an extension of a temporary protective order. Resp. pp. 15:17–16:14. Lehman's time on these matters is fully compensable and Kontrabecki's objections on this point are overruled.

9. *Mission West litigation*

Lehman discovered that Kontrabecki had substantial equity to pay the Award from interests in two limited partnerships, the so-called Mission West interests. Kontrabecki argued that he could not convert those interests to stock, that if he could convert those interests he could not legally sell the stock because he could not require it to be registered, that he held too large a stake in the Mission West entities and was therefore an insider which compli-

cated any liquidation of his interests, that the stock was not traded in sufficient quantities to pay Lehman expeditiously, and that he would be able to pay Lehman out of a Polish development that would be sold in short order. As it turns out, none of this was accurate.

After Kontrabecki was ordered to liquidate his Mission West interests he persuaded the court to appoint an agent of his own choosing to maximize the sales price. That agent resigned, Trustee was appointed as his replacement, and the Mission West interests were then liquidated.

Kontrabecki argues that Lehman "grossly over-simplified and overstated [his] ability to liquidate his Mission West interests." Opp. p. 20:25–26. Assuming without deciding that there is any truth in the accusation, that is irrelevant. If there were more expeditious ways to pay the Award, as Kontrabecki claimed, then he remained free to do so. Meanwhile, whatever complexity was inherent in liquidation of the Mission West interests is not Lehman's fault.

Kontrabecki also argues that Lehman's analysis was simply wrong on some issues and that it should not be compensated for flawed analysis. Opp. pp. 21:23–22:3. The court notes that Kontrabecki's own expert initially opined that he very likely would not obtain freely tradeable stock (id.), but that turned out to be no significant obstacle. The court concludes that both Lehman and Kontrabecki were hampered by a lack of clear information from Mission West entities, and to some extent by misinformation from Kontrabecki who overstated his equity interests such that he appeared to be an insider. The court is not convinced that Lehman's legal analysis was flawed. Ultimately the experts for Lehman and Kontrabecki agreed on the essential issues, once the facts were known.

Kontrabecki argues that Lehman insisted on a defective form of letter, which he was compelled to send to the Mission West principals to liquidate his interests. Opp. pp. 23:20–24:5. The court rejects this argument for two alternative reasons. First, it was primarily Kontrabecki's responsibility to liquidate his interests and pay the Award but he was intransigent so Lehman had to take the leading oar. If there was any defect in Lehman's draft letter then Kontrabecki should have pointed it out. Second, the alleged defect was that a "proper tender had to be submitted on a particular form" (Opp. p. 24:1) but as the court recalls Lehman inquired as to the correct documentation and was not provided any such form because none existed. Lehman's fees should not be reduced for any alleged defect in or delay from the form of tender.

On one issue concerning Mission West the court agrees with Kontrabecki that some of Lehman's fees should be reduced, but Lehman has already done so voluntarily. Lehman's attorneys used a member of their firm, Mr. Titelbaum, both as its legal counsel and as its designated expert witness. Kontrabecki demanded discovery of the materials considered by Mr. Titelbaum and the basis for his opinions, which included attorney-client matters that Lehman did not wish to reveal. The court permitted Lehman to withdraw its designation of Mr. Titelbaum as an expert witness and to designate an alternate expert instead. As Lehman points out, it has already made a $10,000.00 "[c]redit adjustment re Titelbaum expert opinion" in its billings. *See* Benvenutti Decl., Ex. A5, p. 24. The court has reviewed the time associated with that expert opinion and believes that no further adjustment is appropriate.

### 10. *Polish proceedings*

Kontrabecki complains that he and the court are not familiar with many of the

proceedings in Poland and that Lehman's explanations of some of those proceedings are inadequate. Opp. pp. 25:14–26:11. Lehman responds that Kontrabecki never asked for further information but that the time devoted to these matters is de minimis and, if the court directs, it can delete the time spent on these matters. Rather than prolong the litigation over these issues the court will simply reduce Lehman's fees by *$7,500.00* with the direction to Lehman that if its fees on these matters are more than $10,000.00 then it should submit a declaration stating the actual dollar amount and the court will reduce its fees accordingly.

## IV. *Disposition*

The court calculates the total amount disallowed at *$172,000.50.* Counsel for Lehman should upload a proposed form of order awarding it compensatory contempt damages consisting of fees of $3,067,938.86 and expenses of $129,952.16 for a total award of $3,197,891.02, for the reasons stated in this Memorandum Decision, payable on or before 30 days from the date of entry of that order. Lehman should serve that proposed order in compliance with B.L.R. 9021–1.